UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FREDERICK ABRAMS,                    :
                                     :
     Plaintiff,                      :
                                     :
v.                                   :    Case No. 3:09-CV-00541 (RNC)
                                     :
STATE OF CONNECTICUT,                :
DEPARTMENT OF PUBLIC SAFETY,         :
STEVEN FIELDS, PATRICK O'HARA,       :
JOHN TURNER, and BARBARA             :
LYNCH,                               :
                                     :
     Defendants.                     :

MEMORANDUM

        Plaintiff Frederick Abrams brings this case against the
Connecticut Department of Public Safety (DPS), and four of its
employees, alleging discrimination in employment.  In February
2011, the defendants moved for summary judgment.  The motion was
granted in part and denied in part.  A jury returned a verdict
for the defendants on the remaining claims.  The Second Circuit
affirmed in part and vacated and remanded in part.  Following the
remand, the defendants once again moved for summary judgment (ECF
No. 144).  The motion has been denied in an oral ruling.  This
memorandum provides a more complete statement of the reasons for
that ruling.

I. Background

        Plaintiff, a black male, began his employment with DPS in
1986.  Four years later he joined the Eastern District Major
Crimes Unit.  Of the more than thirty detectives assigned to this

1

unit, five or six work on the major crimes van.  They are responsible for investigating particularly serious crimes.

Beginning in 1998, plaintiff expressed interest in joining the van.  Candidates for service on the van are not selected through a formal process.  Instead, detectives make their interest known and submit resumes.  During the relevant time period, selections were made by defendants Sergeant John Turner, who supervised the van, and Captain Patrick O'Hara, the Commanding Officer of the Major Crimes Unit.  Defendant Lieutenant Colonel Steven Fields reviewed their selections.

Between 2004 and 2009, eight detectives were selected for the van.  All were white.  Plaintiff then brought this suit challenging his non-selection.[1]

---

[1]Their selection dates and qualifications are as follows:
- Detective Leitkowski, assigned in 2004, had skills in forensic drawing and diagraming crime scenes.
- Detective McFadden, assigned in 2006, had "strong investigatory skills" and wrote excellent reports.
- Detective Payette, assigned in 2007, possessed strong technical investigatory skills and a college degree.
- Detective Vining, assigned in 2008, was selected because she had a talent for interviewing children and a college degree, and because the crime van needed a female detective.
- Detective Lamoureux, assigned in 2008, was a good interviewer and had a college degree.
- Detective Hoyt, assigned in 2008, had an ability to work with other agencies.  He also had a college degree.
- Detective Cargill, assigned in 2009, was an experienced emergency medical technician and a skilled report writer.
- Detective Kasperowski, assigned in 2009, was a strong interviewer with a master's degree.

In February 2011, defendants moved for summary judgment.  At the third step of the McDonnell Douglas inquiry, the Court concluded that the plaintiff had failed to show that the defendants' proffered reasons for preferring other candidates for the van were a pretext for discrimination.  Plaintiff relied on three pieces of evidence.  First, at some point between 2000 and 2004, a detective named Andrew Matthews asked a member of the van named Contre why plaintiff was not a member.  Contre responded that plaintiff would never be selected for the van because he "did not fit in."  Second, in connection with the selection of Detective Payette in 2007, O'Hara told plaintiff's supervisor that Payette was a "better fit" for the van than the plaintiff.  Third, plaintiff produced evidence suggesting a history of discrimination within DPS.  The Court concluded that the evidence of past discrimination had little probative value and that the statements attributed to Contre and O'Hara did not raise an inference of discrimination.

On appeal, the Second Circuit agreed that the history of discrimination within DPS was not probative.  But it held that the statements attributed to Contre and O'Hara did raise an inference of discrimination.  In the Court's words, Contre and O'Hara "just might" have been talking about race.  Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 253 (2d Cir. 2014).  The Court also stated that the inference of discrimination was

strengthened by the "questionable" nature of the defendants' proffered justifications.  Id. at 254.

Accordingly, the appellate Court vacated the judgment as it pertained to plaintiff's non-assignment to the van.  The Court stated: "[W]e vacate the judgment of the district court granting summary judgment to Defendants on Abrams's Title VII discrimination claim against DPS; and because the analysis is parallel under Abrams's § 1983 Equal Protection Clause claim, we vacate this decision as well and reinstate the relevant individual defendants."  Id.  On remand, the Court noted, it would fall to this Court to determine whether plaintiff's non-selection was an adverse employment action and whether the individual defendants are entitled to qualified immunity on the equal protection claim.

In moving again for summary judgment following the remand, the defendants have raised numerous arguments.  Each argument is addressed below.

II. Discussion

On a motion for summary judgment, the Court's role is limited to determining whether the record presents triable issues of fact.  Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it influences the case's

outcome under governing substantive law.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L.Ed.2d
202 (1986).  A dispute is "genuine" if a reasonable juror could
resolve it in the non-movant's favor.  Id.  The Court must view
the record in the light most favorable to the party opposing
summary judgment, resolving disputes of fact and drawing all
reasonable inferences in favor of the non-movant.  Gallo v.
Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d
Cir. 1994).

A. Plaintiff's Non-Selection in 2004 and 2006: Inference of
Discrimination

     Defendants first argue that the employment actions occurring
in 2004 and 2006 – the selection of Detectives Leitkowski and
McFadden – did not occur in circumstances giving rise to an
inference of discrimination.  They reason that the Second
Circuit's decision relied heavily on O'Hara's remark in 2007 that
Payette was a "better fit" for the van than the plaintiff.
Defendants acknowledge that Contre's "fit in" statement was made
between 2000 and 2004, but they view his statement as a stray
remark by a non-decisionmaker, which cannot by itself support a
reasonable inference of discrimination.

     Defendant's argument concerning the non-selections in 2004
and 2006 must be rejected.  First, it is inconsistent with the
Second Circuit's ruling.  Plaintiff's Title VII claim asserted
that eight white detectives were hired instead of him because of

5

racial discrimination.  The Second Circuit vacated the grant of summary judgment as to the "Title VII discrimination claim."  The opinion draws no distinction between the non-selections in 2004 and 2006, on the one hand, and, on the other, the non-selections in and after 2007.

Second, plaintiff's evidence on the issue of discrimination with regard to the non-selections in 2004 and 2006 goes beyond Contre's remark.[2]  As I read the Second Circuit's opinion, O'Hara's "better fit" statement also supports an inference of discrimination, as does the repeated selection of white candidates for the van.  More specifically, O'Hara's "better fit" statement throws light on Contre's earlier "fit in" statement, and the racial imbalance of van selection throws light on both.[3]

B. Equal Protection

Defendants next argue that the evidence is insufficient to permit a reasonable inference that any individual defendant

_____

[2]The Second Circuit stated in a footnote that it took no position on whether Contre's "fit in" statement "might be properly excluded on other bases not considered here."  Abrams, 764 F.3d at 252.  Citing this language, defendants argue for "exclusion" of the statement on the ground that Contre was not a decisionmaker.  A stray remark by a non-decisionmaker might have so little probative value as to be inadmissible.  But the Second Circuit's opinion establishes that Contre's statement is relevant to the issue of discrimination.

[3]Considering all this evidence together does not run afoul of the rule that each adverse event is legally distinct.  It simply recognizes that one item of evidence, apparently innocuous in itself, can take on new meaning when evaluated alongside other evidence.

violated the Equal Protection Clause.  To prevail on his equal
protection claim, plaintiff must show (1) that he was treated
differently than similarly situated persons outside his protected
group, and (2) that this disparate treatment was based on race.
See, e.g., Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir.
2000).  Defendants contend that he cannot make either showing.

     Defendants' challenge to the equal protection claims cannot
be sustained.  The Second Circuit's opinion does not say in so
many words that the plaintiff was similarly situated to the
detectives selected for the van (or, rather, that a jury could
reasonably so conclude).  But that determination is implicit in
the Court's analysis.  And the Court made it clear that the issue
of the defendants' intent is for the jury.  See Abrams, 764 F.3d
at 253 ("[T]he phrasing 'better fit' or 'fitting in' *just might*
have been about race; and when construing the facts in a light
most favorable to the non-moving party, those phrases, even when
isolated, could be enough to create a reasonable question of fact
for a jury.").

C. Qualified Immunity

     The defendants' next argument is that they are entitled to
qualified immunity, an issue the Second Circuit directed this
Court to address on remand.  This argument must also be rejected.

     The doctrine of qualified immunity "shields federal and
state officials from money damages unless a plaintiff pleads

facts showing 1) that the official violated a statutory or
constitutional right, and 2) that the right was clearly
established at the time of the challenged conduct." Ashcroft v.
al-Kidd, __ U.S. __, __, 131 S. Ct. 2074, 2080, 179 L.Ed.2d 1149
(2011) (internal quotation marks omitted).  An official violates
clearly established law only when, "at the time of the challenged
conduct, the contours of a right are sufficiently clear that
every reasonable official would have understood that what he is
doing violates that right." Id. at 2083.  So long as a
reasonable officer could have thought the challenged conduct
lawful, the acting official is protected by qualified immunity.

Here, defendants argue that Fields is entitled to qualified
immunity because "his involvement in assignments to the van was
limited to overseeing the selections to assure that they were
fair" and he "believed that his actions were lawful."  ECF No.
144-1, at 19.  They argue that O'Hara and Turner are entitled to
qualified immunity because they, too, could have believed their
actions lawful: all the detectives they assigned to the van
possessed special skills that the plaintiff lacked.  To support
the point, they list the eight detectives selected for the van
and their various capabilities.  Id. at 20–21.[4]

_____

[4]The defendants also raise a qualified immunity argument
with respect to Lynch.  The Court addresses this argument in the
next section because Lynch's involvement in the decisionmaking
process differed from that of the other defendants.

The defendants' argument is flawed in two respects.  First, it is not an argument about qualified immunity.  The doctrine of qualified immunity ordinarily turns on the clarity of governing law.  Here, the governing law is clear: the plaintiff alleges that Fields, O'Hara and Turner failed to select him for the van because of his race.  No reasonable official could think that discriminating against the plaintiff on this basis might be lawful.[5]

Defendants' argument, then, is about the merits – whether they acted with discriminatory intent – not about whether their conduct was reasonable in spite of the constitutional violation. This merits-based argument contains a second flaw - it is inconsistent with the Second Circuit's opinion.  Defendants write, for example: "Detective Hoyt had expertise working with other agencies and handling cases involving children and sexual assault.  A reasonable official in defendants Turner's and O'Hara's positions would not have understood that they were violating Detective Abrams's rights by assigning Detective Hoyt rather than Detective Abrams to the van for this reason."  ECF No. 144-1, at 20.  These assertions miss the point of the Second Circuit's ruling.  The case was remanded because a reasonable jury could conclude that Turner and O'Hara did not assign Hoyt to

---

[5] Defendants do not contend that they reasonably believed that non-assignment to the van was not an adverse employment action.

the van "for [that] reason."  It could instead conclude that they
assigned Hoyt to the van because he is white and Abrams is black.
Officials who penalize subordinates for their race are not
entitled to qualified immunity.

In sum, defendants' argument is about the constitutional
merits, not about qualified immunity, and it is untenable in
light of the Second Circuit's ruling.

D. Personal Involvement

Defendants next argue that they cannot be held liable on the
equal protection claims because none of them was personally
involved in plaintiff's non-assignment to the van.  Defendants'
personal involvement in the alleged constitutional deprivation is
"a prerequisite to an award of damages under § 1983."  Back v.
Hastings-on-Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d
Cir. 2004).  When, as in this case, the constitutional violation
contains an intent element, the plaintiff must establish not only
that the defendant had a role in the deprivation but that he
acted with the intent proscribed by law.  Ashcroft v. Iqbal, 556
U.S. 662, 676–77, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009).

The Second Circuit's language concerning the reinstatement
of the equal protection claims leaves some room for
interpretation.  It reads: "[B]ecause the analysis is parallel
under Abrams's § 1983 claim, we vacate this decision as well and
reinstate the *relevant* individual defendants."  (The emphasis is

mine.)  Below, I address the issue of personal participation with respect to each individual defendant.  I think the facts and law are best reconciled with the Second Circuit's language by keeping all the defendants in the case.[6]

1. *O'Hara.*  The defendants argue that no reasonable jury could find O'Hara liable for an equal protection violation because "there has been no evidence that [he] intentionally discriminated against the plaintiff because of his race and/or color."  ECF No. 144-1, at 26.  This argument must be rejected.  O'Hara's "fit in" comment was one of the primary grounds for reversal, and he (along with Turner) made the selections for the van.  If anyone personally participated in the adverse employment actions (and it is certain that some defendants did), it was O'Hara.

2. *Turner*.  Turner supervised the van and, along with O'Hara, selected its members.  He argues that he cannot be held liable because there is no evidence that he intentionally discriminated against Abrams.  The best argument for Turner's position is that none of the evidence on which the Second Circuit primarily relied – the "fit in" comments – directly involved him.  To determine that he is liable for the violation, a jury would

---

[6] Issues concerning the timing of certain selections might preclude individual liability for some of the defendants as to some of the adverse employment actions.  This matter is discussed in more detail below.

have to infer his impermissible intent from comments made by
others.  It is fair to argue that a jury could not reasonably
make that leap, but for a few reasons I nevertheless conclude
that the argument fails.  First, the language of the Second
Circuit's remand order by its own terms embraces equal protection
claims against at least two defendants ("[W]e vacate [the Equal
Protection] decision as well and reinstate the relevant
individual defendants.").  Second, the appellate opinion draws no
distinctions among the defendants who participated in van
selections.  See Abrams, 764 F.3d at 248 ("Defendants Sergeant
John Turner and Captain Patrick O'Hara, under the supervision of
Lieutenant Colonel Steven Fields, then select a detective for the
Van.").  Third, the Second Circuit relied on evidence other than
O'Hara's comment.  Also probative were Contre's "fit in" remark
and the "questionable" justifications advanced by the defendants.
Turner participated in van selections purportedly based on these
weak justifications.  In my view, the Second Circuit's reliance
on these other sources of evidence suggests that it thought a
reasonable jury could find that the entire selection process was
infected with impermissible bias.  Such a finding would implicate
Turner, who was one of two officers chiefly responsible for van
selections.  Accordingly, a fair reading of the appellate opinion
requires that Turner remain in the case.

     3. *Fields.*  Fields argues that he cannot be held liable

because he "merely oversaw the hiring process."  This argument suggests that Iqbal's no-supervisory-liability rule controls the question, but for two reasons I think Fields is properly in the case.  First, as discussed above, the Second Circuit did not meaningfully distinguish among O'Hara, Turner and Fields. Second, despite the defendants' protestations to the contrary, Fields was not merely a supervisor.  The defendants' own Rule 56(a) statement says that Fields's job was to ensure fairness in selections.  ECF No. 65-2, at 7.  Further, in his deposition, Fields stated that he was made aware of the asserted reasons for hiring other detectives but affirmed the decisions nonetheless. For instance, at the time of Payette's hiring, he and O'Hara (and possibly Turner) discussed Payette's college degree as a factor in his selection.  ECF No. 65-5, at 66.  The Second Circuit opinion expresses doubt about the validity of this justification. Fields, then, squarely participated in the decisions passing over the plaintiff for van service, and he asserts that plaintiff's non-selection was valid for reasons the Second Circuit thought suspect.  This level of participation in the challenged conduct is enough for liability to attach.

4. *Timing.*  In their reply brief, the defendants suggest that plaintiff has failed to show that O'Hara and Fields had *any* role in some of the van selections because of changes in their employment status.  O'Hara and Fields cannot be held personally

liable as to employment decisions in which they did not
participate at all.  But the record is unclear as to which
decisions answer to that description.  On the defendants'
telling, neither O'Hara nor Fields was involved in the decisions
concerning Leitkowski (2004), Vining (2008), Hoyt (2008), Cargill
(2009) or Kasperowski (2009).  Given the timing of O'Hara's
changes in employment, that might accurately describe the set of
selections with which he had no involvement.  That would not,
however, seem to be true of Fields, who was District
Administrator between 2007 and 2009, as well as in 2004.  The
Court is unable to resolve this matter on the present record.
Accordingly, the parties have been directed to attempt to reach
agreement about which defendants can be held liable for which
adverse actions.  The issue will be addressed again prior to
trial.

   5.  *Lynch.*  Lynch was the head of the DPS Affirmative Action
Office, and had no role in selecting detectives for the van.  But
at some point between 2004 and 2009, plaintiff spoke with Lynch
about his non-assignment to the van and told her he was being
passed over because of his race.  Lynch suggested that he file a
complaint outside the department instead of with the Affirmative
Action Office, which Abrams interpreted to mean that she would do
nothing to help him.  Abrams never filed a formal complaint with
Lynch.

The defendants argue that Lynch was not involved in the alleged constitutional deprivation because she played no part in the selection process.  This argument presents a close question.  Plaintiff does not suggest that the department's failure to investigate his charge was itself an adverse employment action, so his claim relies on connecting Lynch's failure to investigate to his non-selection for the van.  In the language of § 1983, he must show that Lynch "subject[ed]" him, or "cause[d] [him] to be subjected," to the alleged deprivation.  Compared to those of the other defendants, Lynch's role in the unconstitutional conduct was tangential.  The plaintiff cites no precedent supporting the view that Lynch can be held to answer for the alleged violations, instead simply stating that "Lynch was personally involved in the ongoing constitutional deprivation suffered by Abrams in connection with his claims of being discriminated against."  ECF No. 152-1, at 28.

But several considerations militate against the defendants' argument.  One is that the Second Circuit, in reinstating the equal protection defendants, did not suggest that summary judgment might properly be entered as to any of them.  A second consideration is this: although § 1983's requirement of causation demands a causal link between Lynch's actions and the alleged deprivation, it demands *only* a causal link; it does not require Lynch to have been a participant in the formal decisionmaking

15

process.  Cf. Monfils v. Taylor, 165 F.3d 511, 518 (7th Cir. 1998) (a case that demonstrates the elasticity of § 1983's causal requirement: the defendant police officer, who had recklessly released identifying information concerning a confidential informant, was held liable for the informant's resulting murder). If Lynch had the power to undo the decisions of the other defendants by initiating an investigation but chose not to because of plaintiff's race, she can be said to have actually caused the alleged violations of which he complained.  And if an investigation would have dissuaded the other defendants from future misconduct, but Lynch chose not to undertake one based on plaintiff's race, she can be said to have caused the future violations too.

In my view, the question is simply whether a jury could reasonably draw the inferences required to impose liability on these theories.  I think it could.  I read the Second Circuit's opinion to say a jury might reasonably conclude that Lynch failed to investigate plaintiff's complaint for discriminatory reasons.[7] Whether an investigation would have prevented the violations (either by reversing an already-made decision or forestalling a future decision) is a fact-laden inquiry better undertaken by a

---

[7]For that reason, qualified immunity is out of the question. (As in the case of the other defendants, Lynch's qualified immunity argument does not address the adverse-action element, only the intent element.)

16

jury than the Court.  Accordingly, Lynch must remain in the case.

E. Adverse Employment Action

This Court's initial ruling reserved decision on the issue whether plaintiff's non-assignment to the van qualified as an adverse employment action.  Abrams v. Dep't of Pub. Safety, 856 F. Supp. 2d 402, 409 (D. Conn. 2012).  I now conclude that this issue must be resolved in the plaintiff's favor.

The parties agree that detectives on the van do not receive more pay or better benefits than the other detectives in Major Crimes and that selection for the van was not in any formal sense a promotion.  Plaintiff's argument relies on evidence that van duty was considered a prestigious assignment.[8]

A substantial body of case law supports the proposition that denial of a transfer to a materially more prestigious position constitutes an adverse employment action.  In De la Cruz v. N.Y. City Human Res. Admin. DSS, 82 F.3d 16 (2d Cir. 1996), for example, the Second Circuit held that the plaintiff had satisfied his burden as to this prong of McDonnell Douglas by producing evidence showing that the defendant had "moved him from an 'elite' division of DSS, which provided prestige and opportunity

---

[8]He also argues that he would have made more overtime pay had he been selected for the van.  But this argument was rejected in this Court's first ruling at n.2 ("I find that he has not presented evidence allowing a reasonable fact finder to conclude that his overtime pay would have been greater had he been assigned to the crime van.").

17

for advancement, to a less prestigious unit with little opportunity for professional growth." Id. at 21; see also Williams v. Alliance Nat'l Inc., 24 Fed. Appx. 50, 53 (2d Cir. 2001) ("A plaintiff can show an adverse employment action where, even though she was transferred to a job with the same rank and pay, the new position was arguably less prestigious or entailed diminished responsibilities."); Hardy v. Town of Greenwich, No. 06 Civ. 833 (MRK), 2008 WL 5117370, at *14 (D. Conn. Dec. 3, 2008) ("The move from the Detective Unit, which according to Officer O'Banner was one of the most prestigious units in the Department, to courtroom technician, which Officer O'Banner says was less prestigious, is precisely the type of transfer that may constitute an adverse employment action.").

Plaintiff points to the following evidence tending to establish that the van was an elite assignment. First, Matthew Turner, who worked in Major Crimes between 2000 and 2004, testified in his deposition that the van was a "desired position within the major crimes squad." That was because the position was "elite," drawing only the "best of the best of troopers." Within Major Crimes, "everybody at the time [he] was there aspired to be on the van because the van is the elite members within major crime." Van detectives were the "lead investigators" for most homicides – detectives not assigned to the van would "go and assist" van members. Detectives on the van

were held out to other troopers and the public as "elite" law
enforcement officers.  Matthews DT (manually filed), at 15-17.

Matthews's testimony is corroborated by other evidence.
Turner testified that he tried to hire only the "strongest
investigators" for the van.  Turner DT, at 75.  Fields testified
that he tried to select only detectives who had demonstrated
"excellence" and "[n]ot just good proficiency, but great
proficiency."  He agreed that detectives on the van investigated
most homicides, which was the reason that only the best officers
were selected for service.  Fields DT, at 32-35.  Moreover, more
detectives desired to work on the van than could be accommodated.
Of the more than thirty detectives in Major Crimes, no more than
six served on the van at any given time.

The defendants assert that this evidence fails to show that
plaintiff's non-assignment was an adverse employment action.
They raise several arguments to support the point.  First, they
say, plaintiff has shown only that he experienced subjective
disappointment when he was denied van duty, not that his non-
selection for the van worked any objective material disadvantage.
The defendants are correct to note that the case law
distinguishes between subjective disappointment and objective
disadvantage.  But this principle finds expression chiefly in the
courts' unwillingness to accept a plaintiff's unadorned opinions
as objective evidence of prestige.  For instance, in Monroe v.

City of Danbury, No. 09 Civ. 2132 (DJS), 2014 WL 3943632, at *7

(D. Conn. Aug. 11, 2014), a case on which the defendants rely

heavily, summary judgment was granted for the defendant on the

ground that the plaintiff had failed to adduce evidence that the

position for which he had been denied transfer was materially

more prestigious than his original position: "Monroe further

contends that the SID position is more prestigious than his GID

position. . . . [I]n Beyer, the plaintiff had clear, admissible

proof of the lack of prestige in the plaintiff's current position

. . . . This case is distinguished from Beyer, as the plaintiff

supports this allegation only with [his own] conclusory

deposition testimony."[9]

    In this case, although plaintiff relies mostly on deposition

testimony on the issue of prestige, he relies on deposition

testimony from parties other than himself.  Moreover, those

parties did not offer conclusory statements to the effect that

van duty was prestigious: they explained why they thought so and

why detectives were drawn to the van.  (Basically, they thought

the van prestigious because it was widely known that many

detectives wanted to join it, and many detectives wanted to join

it because it investigated serious crimes and accepted only the

_____

        [9]The plaintiff's deposition testimony read, in relevant
part: "I mean you're working with state, federal and local
agencies constantly.  That's desirable.  That's prestigious.
They're asking, you're working with all kinds of agencies."
Monroe, 2014 WL 3943632, at *7.

very best of troopers.)  <u>Monroe</u>, then, is inapposite.  Indeed,

<u>Monroe</u> takes pains to distinguish this Court's 2012 ruling:

> The facts before the Court are also distinguishable
> from those in <u>Abrams v. Dep't of Public Safety</u> . . .
> where the court found that, "Plaintiff has indeed
> presented some evidence that assignment to the Van
> carries prestige.  Therefore, under <u>Beyer</u>, denial of
> assignment to the Van could be an adverse employment
> action."  <u>See Abrams</u>, 2014 WL 3397609, at *1 ("Van
> detectives have the same pay and benefits as other
> detectives and no change in title, but assignment to
> the Van is considered an elite position occupied by
> the 'best of the best troopers.'" (quoting from the
> deposition testimony of a detective other than the
> plaintiff)).

<u>Monroe</u>, 2014 WL 3943632, at *7.

In sum, the defendants' argument is unpersuasive because it

focuses on the form of the plaintiff's evidence (deposition

testimony) instead of its source (parties other than the

plaintiff) and substance (opinions about prestige that are not

conclusory, but are instead undergirded by supporting facts about

van service).  As a result, this first argument must be rejected.

The defendants' second argument is that Matthews's opinions

about the van shed no light on the plaintiff's non-assignment

because Matthews left Major Crimes in 2004 and most of the

plaintiff's denials of transfer occurred after that.  They place

great weight on this statement from Matthews's deposition: "[T]he

van is a desired position within the major crimes squad.  Or it

used to be.  I don't know if it's so much anymore.  I'm not

sure."  Matthews DT, at 15.  Matthews's testimony, they urge,

therefore has no bearing on whether Abrams's non-assignments in 2006, 2007, 2008 and 2009 were adverse employment actions.

Plaintiff cannot prevail on the basis of a non-assignment to the van unless that non-assignment was an adverse employment action.  But evidence tending to show that one non-assignment qualifies can be applied to others.  Moreover, the plaintiff does not have to produce a witness to testify about attitudes toward the van in 2006, another to testify about attitudes toward the van in 2007, another for 2008, and so on.  The question is not whether a deposition witness has stated, "In 2007 detectives thought such-and-such about the van," but whether the record evidence permits a reasonable inference that the van was a prestigious assignment during the period in question.

I think it does.  Matthews's testimony speaks directly to the way detectives viewed the van between 2000 and 2004.  His description of van duties fits the descriptions offered by Fields and Turner, so the attributes that made the van attractive from 2000-2004 still existed between 2005 and 2009.  In other words, after 2005 – just as before – van detectives still worked almost exclusively on homicides, they were still few in number relative to the Major Crimes unit as a whole, and they were thought to have superior qualifications.  Given that these attributes of van duty did not change, a juror might infer that attitudes toward the van did not change either.

22

Finally, defendants argue that when a plaintiff seeks transfer to an "elite" unit but is denied, it is an adverse employment action only if the position offered other advantages, such as more or better opportunities for career advancement. One case from within the Second Circuit provides support for this proposition. See Chu v. City of New York, No. 99 Civ. 11523 (DLC), 2000 WL 1879851, at *7 (S.D.N.Y. Dec. 27, 2000) ("Plaintiff cites De la Cruz . . . to support his argument that an adverse employment action may exist where the only adverse effect is that an individual was transferred out of a so-called 'elite' unit. The transfer in De la Cruz, however, had meant the loss of both prestige and opportunities for advancement . . . ."). But other cases show that a loss of prestige or other disadvantages can qualify. See, e.g., Williams, 24 Fed. Appx. at 53 ("A plaintiff can show an adverse employment action where, even though she was transferred to a job with the same rank and pay, the new position was arguably less prestigious or entailed diminished responsibilities.") (emphasis added); Monroe, 2014 WL 3943632, at *6 ("A lateral transfer can be an adverse action based on prestige alone."). Accordingly, defendants' argument is rejected.

III. Conclusion

Accordingly, defendants' motion for summary judgment has been denied.

23

So ordered this 21st day of July, 2015.

                                            /s/
                                            Robert N. Chatigny
                            United States District Judge